**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**EDWARD DOUGLAS HART III,**

                              **Plaintiff,**

                                                    **6:16-CV-619 (NAM/TWD)**

**v.**

**CITY OF JOHNSTOWN and the CITY**
**OF JOHNSTOWN POLICE**
**DEPARTMENT,**

                              **Defendants.**
_____

**Appearances:**

BERGSTEIN & ULLRICH, LLP
Stephen Bergstein
5 Paradies Lane
New Paltz, New York 12561
*Attorneys for Plaintiff*

LAW OFFICES OF ANDREA M. MOSS
Andrea M. Moss
3283 Route 9G
Rhinebeck, New York 12672
*Attorney for Plaintiff*

JOHNSON & LAWS, LLC
Gregg T. Johnson
April J. Laws
Corey A. Ruggiero
Loraine C. Jelinek
648 Plank Road, Suite 204
Clifton Park, New York 12065
*Attorneys for Defendants*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

## I.  INTRODUCTION

Plaintiff Edward Douglas Hart III commenced this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., asserting claims against the Defendants City of Johnstown and the City of Johnstown Police Department (collectively, "Defendants") for: (1) discrimination; (2) retaliation; (3) requiring an unlawful medical exam; and (4) related claims under New York State law.[1]  (Dkt. No. 1).  On May 1, 2018, Defendants filed a motion for summary judgment requesting dismissal of Plaintiff's Complaint in its entirety.  (Dkt. No. 62).  Plaintiff has opposed Defendants' motion and cross-moved for summary judgment.  (Dkt. No. 70).  For the reasons that follow, Defendants' motion is granted, and Plaintiff's cross-motion is denied.

## II.  BACKGROUND[2]

### A.  Employment History

Plaintiff began his law enforcement career in 1996 as a deputy sheriff for Beaufort County, South Carolina.  (Dkt. No. 62-2, p. 12).  He served as a deputy sheriff in Beaufort County for approximately five years.  (*Id*.).  In that role, Plaintiff was a road patrol officer responsible for traffic stops, investigating crimes, making arrests, and responding to accidents and alarms.  (*Id*., p. 13).  Plaintiff's employment with Beaufort County ended in 2000 due to Plaintiff's "serious medical condition" involving convulsive seizures.  (*Id*., pp. 15, 38).  Plaintiff was not allowed to return from FMLA leave after he experienced a seizure event while at work.  (*Id*., pp. 14–15; 38).

---

[1] Pursuant to a stipulation by the parties, Michael Julius (as Mayor of the City of Johnstown, in his official and individual capacity), Mark Gifford (in his official capacity and as an individual), and David Gilbo (in his official and individual capacity) were dismissed from this action with prejudice.  (*See* Dkt. No. 55).  Plaintiff has also abandoned his additional ADA claim alleging failure to promote.  (Dkt. No. 70-11, p. 8).

[2] All citations to documents in the record refer to the page numbers identified on the CM/ECF page stamp.

Plaintiff was later hired as a police officer for the Johnstown Police Department ("JPD") in June 2002. (Dkt. Nos. 62-11, ¶ 1; 69, ¶ 1). Plaintiff remains employed as a police officer with JPD. (Dkt. No. 62-2, p. 86). Plaintiff's job duties as a JPD police officer include performing patrol duties in JPD police vehicles, providing emergency medical assistance, using appropriate force to make arrests and detentions when necessary, and conducting crime scene searches. (*Id.*, pp. 23–24). Plaintiff's job duties as a JPD police officer require him to carry a firearm, and require the potential use of force, including discharging a firearm when needed. (Dkt. Nos. 62-11, ¶ 14; 69, ¶ 14).

### B. Plaintiff's Seizure Disorder

Plaintiff has a history of experiencing "convulsive" seizures. (Dkt. No. 62-2, p. 37). When experiencing a seizure event, Plaintiff's body shakes, and he loses consciousness. (*Id.*, p. 35). Plaintiff does not recall experiencing any of his seizures, as he only becomes aware that he suffered a seizure after it has ended. (*Id.*, pp. 35–36). Plaintiff also experiences memory loss and confusion beginning approximately two hours before the seizure event occurs. (Dkt. Nos. 62-11, ¶¶ 24–25; 69, ¶¶ 24–25).

Plaintiff first experienced a seizure in 1999, three years before he applied for employment with JPD. (Dkt. No. 62-2, pp. 28–33). Prior to applying for employment as a JPD police officer, Plaintiff experienced multiple seizures when he lived in South Carolina. (Dkt. No. 62-5, pp. 4–6). Plaintiff testified that his first seizure occurred while he was off duty in South Carolina. (Dkt. No. 62-2, pp. 28–33). During that seizure event, Plaintiff had three seizures over the course of 24 hours, for which he was treated in a hospital for three days. (*Id.*). Plaintiff experienced two additional seizure events while he was working as a deputy sheriff in South Carolina. (*Id.*, pp. 33–37).

In 1992, Plaintiff denied being epileptic when he applied for the police officer position with JPD, but he stated on his medical history form that he had previously experienced a "non-epileptic seizure" due to a "blow to the head," and was being treated with "preventive medication." (Dkt. No. 62-3, p. 2). Plaintiff has been prescribed medication to control his seizures. (Dkt. No. 62-2, pp. 62–63). Plaintiff testified that he does not experience seizures when taking his medication as prescribed. (*Id.*, p. 65). When unmedicated, Plaintiff cannot control when he has a seizure. (Dkt. Nos. 62-11, ¶¶ 22–23; 69, ¶¶ 22–23).

In or about 2005, while employed by JPD, Plaintiff recalled experiencing a seizure-like episode wherein he lost consciousness while he was driving his personal vehicle. (Dkt. No. 62-2, pp. 39–41). During that incident, Plaintiff's vehicle pulled off the road and struck a gas pump. (Dkt. No. 62-8, pp. 10–11). JPD investigated the 2005 incident, but did not require Plaintiff to undergo a medical fitness examination and or take any disciplinary action against him. (Dkt. Nos. 62-11, ¶¶ 31–33; 69, ¶¶ 31–33).

### C. November 2013 Seizure

On November 18, 2013, Plaintiff experienced a seizure event while on duty with JPD. (*See* Dkt. No. 62-2, pp. 59–61). Plaintiff recalled that he "didn't feel good," experienced confusion, and had an upset stomach just prior to the seizure. (*Id.*). These symptoms were typical of the feelings Plaintiff experiences prior to a seizure event. (Dkt. Nos. 62-11, ¶¶ 24–25; 69, ¶¶ 24–25). Plaintiff was transported to the hospital by ambulance immediately following the seizure. (Dkt. No. 62-2, pp. 69–70).

Plaintiff testified that he was not taking his seizure medication as prescribed at that time because he did not like the side effects. (Dkt. No. 62-2, p. 64). Plaintiff's side effects included drowsiness, nausea, dizziness, and confusion. (*Id.*). Plaintiff testified that there were times

4

when he would not take his medication to "level [his] system out." (*Id*.). According to Plaintiff's neurologist Dr. Matthew Lynch, "the most prominent trigger for seizures would be inadequate treatment with antiepileptic medication." (Dkt. No. 62-6, p. 3).

After the November 2013 seizure, Plaintiff voluntarily used the remainder of his contractual vacation time, personal time, and flex time to recover through the rest of December, at which time he was approved to use sick time and other leave until he returned to work. (Dkt. No. 62-2, p. 69). On January 1, 2014, while Plaintiff was on voluntary leave, his New York State driver's license expired. (*Id.*, pp. 86–87).

Plaintiff switched anti-seizure medication in early 2014, and he continues to use that medication to control his seizures through present day. (Dkt. No. 62-2, p. 84). Plaintiff's seizures have been well-controlled by medication since the November 2013 seizure. (Dkt. Nos. 62-11, ¶ 20; 69, ¶ 20).

Johnstown Police Chief Mark Gifford was first informed of Plaintiff's November 18, 2013 seizure when he arrived to work the following day. (Dkt. No. 62-7, p. 17). Chief Gifford initiated an investigation to ascertain whether Plaintiff was capable of safely performing the necessary job functions of a JPD police officer, including Plaintiff's ability to drive an automobile, carry a weapon, and make arrests. (*Id*., pp. 17–18). According to Chief Gifford, JPD does not have a policy prohibiting police officers with epilepsy from serving in the department. (*Id*., pp. 26–27).

### D. Section 72 Notice Letter

On January 23, 2014, while Plaintiff was on voluntary leave, the City sent Plaintiff a letter informing him that he was being placed on involuntary, paid medical leave pursuant to

New York Civil Service Law § 72 ("Section 72"). (Dkt. No. 62-4, pp. 2–3). The City's letter, written by Mayor Michael Julius, states:

> [P]ursuant to Civil Service Law, Section 72(5), I am placing you on an involuntary leave of absence, effective immediately. This action is necessary both to protect your own health, the health and safety of those around you and to avoid a severe interference with operations. Please be assured that in taking this step, the City acts strictly out of concern for your safety and those around you. The leave of absence will continue until such time as your medical condition is clarified.
>
> Please be further advised that pursuant to Civil Service Law, Section 72(1) you are being required to submit to a medical evaluation by a physician selected by the Personnel Officer for the County of Fulton. You will be contacted by that office and advised of the date, time and place of such medical evaluation. If you need transportation to such evaluation, please advise Police Chief Mark Gifford and appropriate arrangements will be made to transport you to the appointment.
>
> The reason for seeking this medical evaluation is the fact that you were observed on November 18, 2013, while on duty, having a seizure while at Police Headquarters. It was noted that the seizure lasted approximately five to eight minutes and that once the seizure had subsided you were not able to recognize or recall that you had just suffered a seizure. There is the additional reason in that a note from your doctor put you out of work from November 25, 2013 through December 9, 2013. The note further indicated that upon your return to work, you were restricted from operating a vehicle or operating 'heavy machinery' which in the City's view would preclude use of your duty weapon.

(Dkt. No. 62-4, p. 2).

The City ordered Plaintiff to return his City-issued badge, police uniforms, and duty weapon. (Dkt. No. 62-7, p. 26). Shortly after receiving the City's notice letter, Plaintiff spoke with Chief Gifford about the fitness for duty examination. (*Id.*, p. 20). During that conversation, Chief Gifford explained that he "was concerned about the safety of the public and [he] needed assurances that [Plaintiff was] fit for duty." (*Id.*).

### E.  Section 72 Medical Examination

#### 1.  Dr. Warren Silverman

The County selected Dr. Warren Silverman to objectively review Plaintiff's medical records and conduct a physical examination to determine whether Plaintiff's epilepsy would prohibit him from safely performing the essential duties of a JPD police officer.  (Dkt. No. 62-5).  Dr. Silverman is board certified in internal and occupational medicine.  (Dkt. No. 70-6, p. 2).  Although he is not board certified in neurology, Dr. Silverman has treated patients with epileptic seizures during his career.  (*Id.*).

On March 12, 2014, Plaintiff presented to Dr. Silverman for his Section 72 independent medical examination ("IME").  (*See generally* Dkt. No. 62-5).  During the examination, Plaintiff indicated to Dr. Silverman that he "ha[d] some problems with processing words."  (Dkt. No. 62-5, p. 6).  According to Dr. Silverman, Plaintiff reported that "[h]e knows what he wants to say but he has trouble saying it."  (*Id.*).  Dr. Silverman observed that: "[Plaintiff] appears to have some mild expressive aphasia, which [was] notable during his examination.  He takes time sometimes to find the right word."  (*Id.*).  Further, Dr. Silverman noted that Plaintiff had a "fine tremor that is notable in both extremities, throughout the examination."  (*Id.*).

In addition to the physical examination, Dr. Silverman also examined Plaintiff's medical history and records as part of the Section 72 evaluation.  (Dkt. No. 62-5, p. 7).  Dr. Silverman offered his assessment as to Plaintiff's medical condition in a final report to Defendants.  (*See generally* Dkt. No. 62-5).  Dr. Silverman's report states:

> My concern is that this gentleman, with this type of seizure presentation, and a service weapon, and/or other emergency situations, which he clearly would be called upon to perform, might find himself in a situation where he would make a decision that was bizarre, inappropriate, and could result in harm or danger to himself or others.

This is quite separate and distinct from the grand mal seizure, where there is a loss of consciousness, loss of ability to perform any of the duties of a police officer, and in which he becomes incapacitated. Obviously, that would be a difficult situation for his partner and potentially for him in a life or death situation, but there does appear to be some tolerance to that possibility, even in the act of driving in which obviously a seizure would also be a life threatening situation.

However, I am much more concerned about the fact that this gentleman can remain active, can continue to function, but can make bizarre and unusual decisions and choices as part of an epileptic discharge coming from the abnormality of his brain.

It would be my recommendation that this gentleman would pose a particular hazard to himself or others, and it would be my recommendation that he not be allowed to have access or use of a service weapon during the course of his employment. Obviously this would prevent him from being a police officer with access to the public.

I recognize that this singles out this gentleman in the complete spectrum of individuals with epilepsy, as one in which there is a higher level of restriction, but I believe it is because of the history of the nature of his aura, and the potential that this could result in a decision and an action that he has no control over which he would regret later, and which others would regret as well.

I believe that this is a special circumstance in which additional restriction identified as the lack of authorization to have, use or have access to a firearm during the performance of his employment, is a reasonable precaution for the good of the general public and for himself.

Other aspects of his presentation do have some concern. He clearly still has an expressive aphasia, difficulty finding the words to utilize. That is in spite of being on different medication. I do not think that this is a medication issue, but may represent some issue with regard to the association fibers in his brain. There are also some notations with regard to [his] ability to have accurate memory, made by his neurologist. I think if that was to be investigated further he could have neurodiagnostic testing done to see exactly how much function he has, with regard to memory.

I believe that the decision that he not be allowed to be a police officer is the proper and correct one at this point.

(*Id*., pp. 9–10).

## 2. Administrative Leave

After receiving Dr. Silverman's report, Chief Gifford reviewed the conclusions with Lieutenant Gilbo, Mayor Julius, and City Attorney Amy Roach. (Dkt. No. 62-7, p. 29). Chief Gifford determined that Plaintiff would pose a danger to the public if he returned to duty as JPD police officer, and therefore should be terminated. (*Id*., p. 21). The City allowed Plaintiff to use all of his accrued leave and then placed Plaintiff on paid Section 72 leave. (*Id*., p. 30).

## F. Section 72 Appeal and Hearing

After receiving Dr. Silverman's report, Plaintiff requested a Section 72 hearing to appeal the City's determination. (Dkt. Nos. 62-11, ¶ 84; 69, ¶ 84). As part of that appeal process, Plaintiff was examined by Drs. Matthew Lynch and Timothy Lynch. (Dkt. Nos. 62-6; 70-5).

## 1. Dr. Matthew Lynch

In May 2014, Plaintiff was evaluated by neurologist Dr. Matthew Lynch. (Dkt. No. 62-5, p. 2). Plaintiff also saw Dr. Lynch two or three times prior to his IME with Dr. Silverman in March 2014. (*Id*.). On May 27, 2014, Dr. Lynch prepared a medical report evaluating Plaintiff's seizure condition and clearing Plaintiff to return to work, subject to various conditions. (*See generally* Dkt. No. 62-6). Dr. Lynch stated that "the main question with respect to fitness for work is the risk of having a seizure." (*Id*., p. 3). Dr. Lynch further assessed that:

> [A] generalized tonic clonic seizure is as dangerous with respect to
> fitness to work as a complex partial seizure. The latter represents a
> potential risk if he is carrying a weapon since he would be confused
> and could perform complex actions without rational deliberation. I
> do think the chance that he would discharge a firearm in a manner
> that would pose risk to someone else during a seizure would be
> improbable. On the other hand, generalized tonic clonic seizures

would pose just as much of a risk as carrying a weapon because loss of consciousness while driving a vehicle would be equally as deadly.

. . . .

I do not think that the seizure type, whether it be generalized tonic clonic or complex partial, makes a difference for the reasons noted above. I think he is unlikely to have a seizure if he follows medical advice because his epilepsy appears easy to control and all of the seizures for which we have definite information [ ] were provoked. Thus, if he avoids triggers, he should be able to return to work. In his case, the most prominent trigger for seizures would be inadequate treatment with antiepileptic medication.

(Dkt. No. 62-6, p. 3).

Dr. Lynch's report concluded that:

If [Plaintiff] abides by the following recommendations, I think he would be safe to work, even in a capacity where loss of consciousness could pose a risk, because I think he would be unlikely to have a seizure:

(l) He should not miss any dose of medication and should not go to work if he misses a dose of medication;

(2) He should avoid sleep deprivation;

(3) He should abstain from alcohol;

(4) He should call out sick from work if he develops the characteristic prodrome that he gets prior to tonic clonic seizures.

If he misses a dose of medication, is sleep deprived, or has drank alcohol, I recommended that he does not work or drive a motor vehicle until the situation is resolved. But if he follows these recommendations, he should be able to work or drive without restriction.

(Dkt. No. 62-6, p. 3).

After receiving medical clearance from Dr. Lynch, Plaintiff was able to receive an interim driver's license on July 1, 2014. (Dkt. No. 70-4, p. 3). On July 3, 2014, Plaintiff requested a return to duty by letter from his attorney notifying the City that:

> Police Officer Edward Hart has been authorized to return to full duty by his treating neurologist. His driver's license has been issued. [ ]
>
> As you know, Officer Hart has been absent on sick leave. No final action was ever taken by the City pursuant to Civil Service Law § 72. Therefore, Officer Hart's medical clearance is sufficient for the City to return him to work. Please have the Chief contact him for scheduling purposes.

(Dkt. No. 70-4, p. 1).

### 2. Dr. Timothy Lynch

On February 4, 2015, Plaintiff met with a second neurologist, Dr. Timothy Lynch, as part of the Section 72 appeal process. (Dkt. No. 70-5). Following that examination, Dr. Timothy Lynch cleared Plaintiff to return to work without restrictions, stating that:

> Edward Hart was seen in the Epilepsy Clinic at Albany Medical College. Mr. Hart has a history of well controlled epilepsy on anti-convulsant therapy. Mr. Hart's last seizure was 14 months ago and as such is not under any work restrictions.

(*Id.*).

### G.   Section 72 Hearing and Decision

A Section 72 hearing was held on February 26 and April 27, 2015, at which Dr. Silverman and Dr. Timothy Lynch both testified. (*See* Dkt. Nos. 70-6; 70-7). At the hearing, Dr. Silverman reiterated his opinion that Plaintiff was medically unable to perform the duties of a police officer. (Dkt. No. 70-6, pp. 6–7, 10–14). Dr. Silverman testified that his greatest concern centered on Plaintiff's suffering from a "prodrome of confusion and problems with planning and executive function," also known as an "aura period." (Dkt. No. 70-7, pp. 44–45).

Although Dr. Silverman acknowledged that Plaintiff had switched medications and had not suffered a seizure in over 15 months, Dr. Silverman testified that he still believed that Plaintiff's potential return to work presented "too much risk." (*Id.*, pp. 70–71).

By contrast, Dr. Timothy Lynch testified that Plaintiff's epilepsy was well-controlled by his new medication, and that he was fit to return to work. (Dkt. No. 70-6, p. 31). According to the hearing officer, "Dr. Lynch testified that since he has been at Albany Medical Center he has cleared other police officers with epilepsy to return to work. [Dr. Lynch] also says that he understands the job requirements of a police officer in much the same way as the general population, and knows that officers carry loaded weapons, place people in custody, and drive." (*Id.*, pp. 16–17). Further, the hearing officer noted that:

> Asked if he had an opinion as to whether Officer Hart had an issue complying with his epilepsy medications, the doctor said he did not think it was a current issue. Referring to the note of his examination (Employee Exhibit 1) he testified that the officer felt poorly when taking the required dose of Dilantin, and that although he could feel the Keppra he was switched to in his system, it was 'certainly better than the Dilantin' (Tr. 2 at 16). He also explained that he reduced the Keppra dose, and that the officer felt 'great' after that, no longer feeling it in his system or having any side effects (Tr. 2 at 17). Finally, on the medication issue, the doctor noted that Keppra is a better medication than Dilantin for the general type of epilepsy from which Officer Hart suffers (Tr. 2 at 27-28).

On July 27, 2015, the Section 72 hearing officer found in Plaintiff's favor, concluding that:

> Officer Hart has been switched from Dilantin, a medication not appropriate for his type of epilepsy, and placed on Keppra, one that is effective, and after having the dosage adjusted by Dr. Timothy Lynch, experiences no side effects. In fact the doctor testified that there are no known long term side effects from taking Keppra. And, by the second day of hearing, he had not had a seizure for 17 months.

There is no good reason not to credit Dr. Timothy Lynch's opinion that Officer Hart is able to safely return to his police officer position with the City.

The City has not established, as required under CSL Section 72, that Officer Hart is unable to perform the duties of his position because of his epilepsy, and, therefore, and in accordance with the above findings and conclusions, the hearing officer finds that he is medically fit to work, and recommends that the officer be forthwith returned to his police officer position.

(Dkt. No. 70-6, p. 32).

### H. Return to Work

Plaintiff returned to work as a full-duty JPD police officer on August 6, 2015. (Dkt. No. 62-2, p. 77). Despite being on leave from November 2013 to August 2015, Plaintiff remained a member of the JPD Patrol Division and was paid for all of the time he was on Section 72 leave. (Dkt. Nos. 62-11, ¶¶ 97–98; 69, ¶¶ 97–98).

## III.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Further, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and the grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citing *Dister v. Continental Group, Inc*., 859 F.2d 1108, 1114 (2d Cir. 1988)). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

## IV. DISCUSSION

Plaintiff's Complaint asserts four causes of action stemming from his treatment following his November 2013 seizure event: (1) discrimination in violation of the ADA; (2) retaliation in violation of the ADA; (3) unlawful medical examination; and (4) discrimination in violation of the New York Executive Law Sections 290 and 296. (*See* Dkt. No. 1). In moving for summary judgment, Defendants argue that: (1) Plaintiff is not a "qualified individual" under the ADA because he does not suffer from a substantial limitation of a major life activity due to his epilepsy; (2) Defendants did not violate the ADA because they reasonably believed that Plaintiff's continued employment posed a direct threat to public safety following his November 2013 seizure event; and (3) Plaintiff's placement on Section 72 leave does not constitute an adverse action. (*See* Dkt. No. 62-10). The Court will consider each of Plaintiff's claims in turn.

## A. ADA Discrimination

Plaintiff's ADA discrimination claim appears to allege that Defendants discriminated against him based on his epilepsy by "placing him on administrative leave and refusing to timely reinstate Plaintiff to his position." (Dkt. Nos. 1; 70-11, p. 8).

Under Title I of the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). Under the *McDonnell Douglas* test, a plaintiff must first establish a prima facie case of discrimination under the ADA. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Next, if an employee establishes a prima facie case, "the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Id.* The Court will assess Plaintiff's ADA discrimination claim at each step of the *McDonnell Douglas* test.

### 1. Prima Facie Case

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show that: (1) the defendant is subject to the ADA; (2) plaintiff suffers from a disability within the meaning of the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse

15

employment action because of his disability. *See McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (citing *Sista*, 445 F.3d at 169). "Under the last element, a plaintiff must show that the adverse employment action took place under circumstances giving rise to an inference of discrimination." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). Plaintiff's burden at the prima facie stage is *de minimis*. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). The parties do not dispute that Defendants are subject to the ADA. Therefore, the remaining questions are: (1) whether Plaintiff was disabled within the meaning of the ADA; (2) whether Plaintiff was qualified to perform the essential job functions of a JPD police officer; and (3) whether Plaintiff suffered adverse employment actions because of his disability.

### i. Plaintiff's Disability

Defendants argue that Plaintiff is not a "qualified individual" under the ADA because he does not suffer from a disability as defined by the ADA. (Dkt. No. 62-10, pp. 18–20). According to Defendants, Plaintiff is not disabled as a matter of law because "no substantial limitation of a major life activity can be shown where an individual is able to correct his or her physical or mental impairment through the use of medication. Therefore, when a plaintiff concedes that the use of medication controls his epilepsy and prevents him from having seizures, that plaintiff is unable to show that he is disabled within the meaning of the ADA." (*Id.*, p. 19). Plaintiff responds that "[t]he record in this case is replete with evidence about the nature of Plaintiff's disability, and how epilepsy affects him physically and mentally when he does not take his medication. Plaintiff becomes disoriented and ultimately loses consciousness." (Dkt. No. 70-11, p. 25). Plaintiff contends that Defendants rely on authorities that are "no longer good law," and that "epilepsy is the kind of impairment that should 'easily' be found to constitute an

ADA-qualifying disability because, irrespective of the frequency and/or duration of resulting seizures, it 'substantially' limits neurological function." (*Id.*, pp. 25–27).

The ADA defines a disability as: (1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). The Act states that: "The definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [the ADA]." *Id.* at § 12102(4)(A). Under the first method of establishing a disability, Plaintiff's epilepsy must be shown to be: (1) a physical or mental impairment, which (2) substantially limits, (3) one or more of his major life activities. *See Fall v. New York State United Teachers*, 289 F. App'x 419, 420 (2d Cir. 2008). Notably, EEOC regulations expressly provide that epilepsy qualifies as a physical or mental impairment. *See* 29 C.F.R. § 1615.103(1)(ii); *see also Muller v. Costello*, 187 F.3d 298, 312 (2d Cir. 1999) (stating that "[EEOC regulations] are entitled to great deference in interpreting the ADA"). Therefore, the question here is whether Plaintiff's epilepsy substantially limits any of his major life activities.

The ADA regulations acknowledge that major life activities include, but are not limited to walking, standing, concentrating, thinking, and communicating, as well as major bodily functions such as functioning of the neurological and musculoskeletal systems. 29 C.F.R. § 1630.2(c)(1)(i)(ii). The regulations further state that "epilepsy [ ] substantially limits neurological function." *Id.* § 1630.2(j)(3)(iii).

First, Defendants' reliance on *Charneco v. Dep't of Education* is misplaced. (Dkt. No. 62-10, p. 19). In that case, the court reasoned that "[h]aving conceded that the use of medication controls her epilepsy and prevents her from having seizures, plaintiff is unable to show that she

is disabled within the meaning of the ADA." *Charneco*, No. 04-CIV-1848, 2006 U.S. Dist. LEXIS 2281, at *10, 2006 WL 148934, at *3 (S.D.N.Y. Jan. 18, 2006). The court found that the plaintiff's epilepsy did not substantially limit any major activity where the plaintiff never suffered a seizure while at work, and she conceded that her epilepsy did not impair her ability to work. *Charneco*, 2006 U.S. Dist. LEXIS 2281, at *9–11, 2006 WL 148934, at *3–4. As indicated by Plaintiff, the ADA was amended in 2008 to clarify that ADA protections extend to individuals even where their disabilities are episodic, intermittent or otherwise controlled with mitigating medical treatment. *See Morea v. Fanning*, No. 15-CIV-2720, 2017 U.S. Dist. LEXIS 123467, at *17–19, 2017 WL 3393843, at *6–7 (S.D.N.Y. Aug. 4, 2017) (reasoning that the 2008 amendments to the ADA were intended to extend protections to individuals with conditions that are episodic or intermittent). Indeed, the Second Circuit has acknowledged that the ADA was specifically amended to reject judicial interpretations that "ameliorative effects of mitigating measures" should be considered when analyzing "whether an impairment substantially limits a major life activity." *Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31, 43, n.13 (2d Cir. 2015). Therefore, because *Charneco* was decided before the 2008 amendments to the ADA, Defendants' reliance on that case does not reflect current law.

As to Plaintiff's epilepsy, the record shows that he suffered a number of seizure events beginning in 1999, including several which occurred while he was on duty as a police officer. (Dkt. No. 62-2, pp. 28–33). During these seizures, Plaintiff becomes disoriented, his body begins to shake, and he loses consciousness. (*Id.*, p. 35). Plaintiff experiences memory loss and confusion beginning approximately two hours before the seizure event occurs. (Dkt. Nos. 62-11, ¶¶ 24–25; 69, ¶¶ 24–25). Plaintiff's condition routinely requires hospitalization following a seizure. (Dkt. No. 62-2, pp. 28–33, 69–70). Plaintiff's November 2013 seizure required several

months of recovery and a transition to a new medication before his doctor determined he was fit to return to duty.  (*Id.*, p. 69).  In addition, Plaintiff's condition following the November 2013 seizure event was concerning enough for Defendants to place Plaintiff on Section 72 medical leave and require him to undergo an IME.  During that examination, Dr. Silverman noted concern that Plaintiff "[could] remain active, [could] continue to function, but [could] make bizarre and unusual decisions and choices as part of an epileptic discharge coming from the abnormality of his brain."  (Dkt. No. 62-5, p. 9).

Based on these records, Plaintiff has adduced sufficient evidence to meet his *de minimis* burden to establish that his epilepsy qualifies as a sufficiently limiting disability under the ADA. *See Karatzas v. Herricks Union Free Sch. Dist.*, 2017 U.S. Dist. LEXIS 112397, at \*26–40, 2017 WL 3084409, at \*9–14 (E.D.N.Y. July 18, 2017) ("viewing the medical evidence in the light most favorable to the Plaintiff, the Court finds that a jury could logically conclude that, when active—that is, in times of seizure—the Plaintiff's epilepsy substantially limits his ability to walk, stand, think, speak, move, and maintain consciousness"); *see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc*., 263 F.3d 208, 216 (2d Cir. 2001) (collecting cases and acknowledging that "epilepsy constitutes a disability under the ADA, a proposition that is well established.").

### ii.   Plaintiff's Qualification and the Direct Threat Defense

Next, Defendants argue that Plaintiff's seizure condition prevented him from being able to perform essential functions of his job, and further, they assert an affirmative defense that Plaintiff's condition posed a "direct threat" to public safety.  (Dkt. No. 62-10, pp. 18–26). Plaintiff responds that his condition was well-controlled by medication, and that he was qualified to perform essential functions of a JPD police officer despite his seizure condition. (Dkt. No. 70-11, pp. 27–31).

According to the ADA, "[t]he term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). The ADA further provides that:

> It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

42 U.S.C. § 12113(a). "The term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." *Id*. § 12113(b). "The direct threat defense must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or whether the best available objective evidence." *Lovejoy-Wilson*, 263 F.3d at 220 (citing *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998)). An individualized assessment is required to evaluate an employee's present ability to safely perform the essential functions of the job based on medical or other objective evidence. *Id*. "To determine whether an individual poses a direct threat, [courts] must consider factors including: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of potential harm." *Id*. The burden is on the defendant to establish that a plaintiff poses a direct threat of harm to others. *Hargrave v. Vermont*, 340 F.3d 27, 35 (2d Cir. 2003).

In support of the direct threat defense, Defendants argue that "[i]t is undisputed that, prior to November 18, 2013, Plaintiff experienced recurrent seizures as a result of his disorder," and that "it is undisputed that Plaintiff made a number of bizarre decisions/actions immediately before his seizure and was temporarily unresponsive during the seizure." (Dkt. No. 62-10, p.

21). Defendants also claim that "it is undisputed that working as a police officer requires the officer to remain continuously vigilant and that critical events could occur at any given point in time while on-duty, the dire consequences that could result if Plaintiff were to experience another seizure while on duty." (*Id.*, pp. 24–25). In opposition, Plaintiff appears to argue that he was not a threat due to his condition, and that he was otherwise denied a timely return to work despite clearance from his neurologist. (Dkt. No. 70-11, pp. 27–28). Plaintiff claims that Dr. Silverman has little experience treating epilepsy, and that his expertise in this field cannot match that of Drs. Matthew Lynch and Timothy Lynch. (*Id.*, pp. 32–34). Citing the EEOC Interpretive Guidance to ADA, Plaintiff notes that "employers cannot deny an employment opportunity to an individual with a disability merely because of a slightly increased risk," and contends that significant risk must be demonstrated by a "high probability of substantial harm [and] speculative or remote risk is insufficient." (*Id.*, pp. 28–31, citing 29 C.F.R. § 1630.2(r)).

As previously noted, Defendants' selected medical examiner, Dr. Silverman, found that Plaintiff was unfit to return to work under any circumstances given his medical history, (Dkt. No. 62-5), whereas two board certified neurologists later concluded the opposite, (Dkt. Nos. 62-6; 70-5). Plaintiff contends that that Dr. Silverman was not the proper medical expert to examine Plaintiff, and that Defendants "relied upon an unreasonable medical judgment in determining whether Plaintiff could return to work." (Dkt. No. 70-11, p. 33). Notably, the hearing officer considered all of the medical evidence regarding the level of potential risk posed by Plaintiff's return to work, and ultimately found that Plaintiff was in fact fit to return to work. (*See generally* Dkt. No. 70-6).[3] The hearing officer found that Dr. Silverman's concerns "were dispelled by Dr. Timothy Lynch." (*Id.*, pp. 25–26).

---

[3] Plaintiff further argues that "[t]he [Section 72] hearing officer's favorable determination following the [Section 72] hearing is entitled to collateral estoppel effect." (Dkt. No. 70-11, pp. 31–34). However, "to have preclusive

Altogether, the record shows conflicting evidence as to the level of threat posed by Plaintiff's condition to the health or safety of others, which raises questions of fact. Viewing the evidence in the light most favorable to Plaintiff, a jury could reasonably conclude that Plaintiff was qualified to perform the essential functions of the job and did not pose a direct threat. Accordingly, Defendants' direct threat defense is not an appropriate basis for summary judgment at this time, and Plaintiff has met his *de minimis* burden to show that he was qualified to perform the essential functions of the job. *See Abbate v. Cendant Mobility Servs. Corp.*, No. 03-CIV-1858, 2007 U.S. Dist. LEXIS 50623, at *20–22, 2007 WL 2021868, at *7 (D. Conn. July 13, 2007) (finding that, for purposes of establishing a prima facie case, an employee's medical clearance by her own doctor was sufficient evidence to show that she was otherwise qualified for her position).

### iii. Adverse Employment Action

Finally, Defendants argue that Plaintiff's placement on Section 72 leave does not constitute an adverse employment action for purposes of Plaintiff's prima facie case. (Dkt. No. 62-10, p. 26–31). Plaintiff's theory as to adverse employment actions appears to be based on:

---

effect over a subsequent fact-finding or legal analysis, a prior administrative determination must have resolved the identical issue, and the issue must have been actually and finally decided in the prior adjudication." *Matusick v. Erie County Water Auth.*, 757 F.3d 31, 45 (2d Cir. 2014). Here, the combination of Plaintiff's burden to show qualification and Defendants' burden as to the direct threat defense requires the Court to evaluate the objective reasonableness of Defendants' decision to place Plaintiff on Section 72 leave at the time that decision was made in January 2014. *See Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002). By contrast, the question before the Section 72 hearing officer was whether Plaintiff was fit to return to work as of April 27, 2015, the final day of the hearing. (Dkt. No. 70-6). Therefore, the hearing officer evaluated the risk associated with Plaintiff's condition approximately *17 months after* Plaintiff's November 2013 seizure, and approximately *15 months after* Defendants initiated the Section 72 process. Further still, this case involves an entirely different issue: whether Defendants violated the ADA, not whether Plaintiff was fit to return to work at any given time. Accordingly, given these significant differences, the hearing officer's decision is not entitled to preclusive effect. *See Quadir v. New York State Dep't of Labor*, No. 16-CIV-7476, 2017 U.S. Dist. LEXIS 152138, at *9-11, 2017 WL 4217137, at *3–4 (S.D.N.Y. Sept. 19, 2017) (rejecting request to apply collateral estoppel, "issue preclusion," as to findings made by a Section 72 hearing officer).

(1) his placement on Section 72 leave; and (2) Defendants' alleged failure to timely reinstate him to his position.  (*See generally* Dkt. Nos. 1; 70-11).

An adverse employment action is defined "as a materially adverse change in the terms and conditions of employment." *Sanders v. New York City Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir. 2004).  A "materially adverse" change must be something "more disruptive than a mere inconvenience or an alteration of job responsibilities," and may include, for example, "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).  There is "no bright-line rule to determine whether a challenged employment action is sufficiently significant to serve as the basis for a claim of discrimination." *Davis*, 804 F.3d at 235.

Requiring an employee to submit to a Section 72 exam does not, without more, constitute a "materially adverse change," even if the request is inappropriate. *Brady v. Dammer*, 573 F. Supp. 2d 712, 724 (N.D.N.Y. 2008) (citing *Baum v. Rockland County*, 161 F. App'x 62, 64 (2d Cir. 2005)); *Jackson v. City Univ. of New York*, No. 05-CIV-8712, 2006 U.S. Dist. LEXIS 43221, at *9–11; 2006 WL 1751247, at *3–4 (S.D.N.Y. June 23, 2006).  Indeed, Section 72 expressly authorizes an employer to place an employee on immediate leave without pay if the employer has probable cause to believe that "the continued presence of the employee on the job represents a potential danger to persons or property . . . ." N.Y. Civ. Serv. Law § 72(5).  "If [the employee] is finally determined not to be physically or mentally unfit to perform the duties of his or her position, he or she shall be restored to his or her position and shall have any leave credits or salary that he or she may have lost because of such involuntary leave of absence restored to him or her . . . ." *Id.*

Here, Plaintiff has not responded to Defendants' argument that Plaintiff's placement on Section 72 leave did not constitute an adverse action. (*See* Dkt. No. 70-11). But Plaintiff argues that Defendants violated the ADA by refusing to reinstate him in a timely manner. (*Id.*, p. 8). The record shows that Plaintiff's Section 72 leave lasted over 18 months; Plaintiff appealed Defendants' decision to place him on Section 72 leave, and Plaintiff was ultimately found fit for duty by the Section 72 hearing officer at the conclusion of the appeal and review process. (*See* Dkt. Nos. 62-2, p. 77; 62-4, pp. 2–3; 70-6). Given Plaintiff's *de minimis* burden at the prima facie stage, the Court will assume for purposes of this decision that his placement on Section 72 leave, combined with over 18 months on leave before reinstatement, amounts to an adverse action. *See Greenberg v. New York City Transit Auth.*, 336 F. Supp. 2d 225, 247 (E.D.N.Y. 2004) (recognizing that under some circumstances an adverse action may involve "a delay in reinstating an employee").

Next, Plaintiff must show that the adverse action "took place under circumstances giving rise to an inference of discrimination." *Flieger v. Eastern Suffolk BOCES*, 693 F. App'x 14, 17 (2d Cir. 2017) (citing *Davis*, 804 F.3d at 235). Here, the record shows that Plaintiff's placement on Section 72 medical leave was based on Defendants' concern that he was unable to safely perform essential functions of his job as a police officer, such as operating an automobile, carrying a service weapon, and making arrests. (Dkt. Nos. 62-7, pp. 18–19, 22; 62-5, pp. 9–10). It is undisputed that Plaintiff's placement on Section 72 leave was precipitated by his November 2013 seizure while he was on duty. (*See* Dkt. No. 62-4). Plaintiff's neurologist suggested that his past seizures were "provoked" by preventable triggers that Plaintiff failed to avoid, including Plaintiff's failure to take his antiepileptic medication as prescribed. (Dkt. No. 62-6, p. 3). The record also shows that Defendants only invoked Section 72 after Plaintiff had taken several

weeks of voluntary leave to recover from his November 2013 seizure, and after Plaintiff's driver's license had expired. (Dkt. No. 62-02, pp. 69, 86–87).

Nonetheless, Plaintiff argues that Defendants "relied upon an unreasonable medical judgment in determining whether Plaintiff could return to work." (Dkt. No. 70-11, pp. 33–36). Plaintiff cites Dr. Silverman's lack of certification in the area of neurology, as well as the Section 72 hearing officer's rejection of Dr. Silverman's ultimate medical determination as evidence that Defendants relied on incorrect medical advice in determining that Plaintiff was unfit for duty. (Dkt. No. 70-11, pp. 14–15, 33–34). Plaintiff also claims that Chief Gifford relied on his own ill-informed views of epilepsy in refusing to reinstate him, and that Chief Gifford told him that "unless a doctor guaranteed that I would never have a seizure again that I would not work there anymore." (*Id.*, pp. 34–35). Given the *de minimis* burden at the prima facie stage, Plaintiff has raised an issue of fact, albeit barely, that the adverse employment action took place under circumstances giving rise to an inference of discrimination.

### 2. Legitimate, Non-Discriminatory Purpose

At the second step of the *McDonnell Douglas* analysis, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employee's treatment. *McDonnell Douglas Corp.*, 411 U.S. at 802. This burden is satisfied if the defendant's given reason, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). Thus, when a defendant produces some evidence of a legitimate reason for its employment decision, the inference of discrimination is rebutted, and the burden shifts back to the plaintiff. *Burdine*, 450 U.S. at 255.

In this case, Defendants contend that Plaintiff was placed on Section 72 leave for a legitimate, non-discriminatory reason: his seizure disorder, which they claim posed a threat to public safety and prevented him from performing essential job functions. (Dkt. No. 62-10, pp. 20–21). Defendants note that Plaintiff admitted that he could not perform essential functions of his job during a seizure event, including making arrests and detentions, carrying a firearm, operating police vehicles, providing emergency medical assistance. (*Id.*, p. 21, citing Dkt. No. 62-2, pp. 73–76). Defendants further claim that Plaintiff's loss of consciousness and disorientation during a seizure event could pose a threat to the public if he was driving a vehicle or carrying his service weapon. (*Id.*, pp. 24–25). Defendants point out that "the only accommodation identified by Plaintiff and Plaintiff's own medical treatment provider . . . is his ability to use sick time in the event he had a seizure or feels a seizure coming on." (*Id.*, p. 25). Defendants argue that "prior to the determination of the Section 72 hearing officer, it was reasonable for the City to conclude that this sick time accommodation did not eliminate the safety and security risk posed by Plaintiff's disorder, especially since he had a history of not taking his medication as prescribed and ignoring the signs of an impending seizure while continuing to work." (*Id.*, pp. 25–26). There is at least some evidence in the record to support Defendants' public safety concerns, particularly Dr. Silverman's medical opinion that Plaintiff could not safely return to duty as a police officer. (Dkt. Nos. 62-7, pp. 18–19; 62-5, pp. 9–10).

Accordingly, Defendants have satisfied their burden to show a legitimate, non-discriminatory reason for placing Plaintiff on Section 72 leave, which also supports their decision not to reinstate Plaintiff until after the hearing officer's decision was issued. *See Gaines v. New York City Transit Auth.,* 528 F. Supp. 2d 135, 147–48 (E.D.N.Y. 2007) (finding that city transit authority's directive prohibiting train operator with bilateral hearing aids from

26

operating trains in designated train yard was motivated by legitimate public safety concerns and, as such, did not constitute unlawful employment discrimination under the ADA), *aff'd*, 353 F. App'x 509, 510–11 (2d Cir. 2009); *Shannon v. New York City Transit Auth.*, 189 F. Supp. 2d 55, 64–65 (S.D.N.Y. 2002) (finding that an operator's inability to perform essential functions of his position and ensure public safety was legitimate, non-disability based reason for authorities to terminate the operator), *aff'd*, 332 F.3d 95, 99–103 (2d Cir. 2003).

### 3. Unlawful Discriminatory Pretext

At the third and final step, the plaintiff bears the ultimate burden of proving that the reason proffered by the employer was a pretext for unlawful discrimination. *St. Mary's Honor*, 509 U.S. at 516–18 ("inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced"). To survive a motion for summary judgment, the plaintiff must "establish a genuine issue of material fact . . . as to whether the employer's reason for [the adverse action] is false and as to whether it is more likely that a discriminatory reason motivated the [ ] decision." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1225 (2d Cir. 1994). In other words, the plaintiff must do more than show that the employer's reason is false, but must also, at the very least, "point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). Generally, to demonstrate pretext, "plaintiff[s] may rely on evidence comprising [their] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Pretext may be shown by, *inter alia*, "demonstrating weaknesses, implausibilities,

27

inconsistencies, or contradictions in the employer's proffered legitimate" non-discriminatory reasons for its action. *Id.* at 846.

Here, Plaintiff argues that Defendants' "decision to place Plaintiff on administrative leave was ill-informed and based on generalizations about the nature of Plaintiff's disability," and that "Defendant[s] placed Plaintiff on administrative leave based on unfounded assumptions, contrary to the ADA." (Dkt. No. 70-11, pp. 34–35). As evidence, Plaintiff relies on Chief Gifford's alleged statement that "unless a doctor guaranteed that [Plaintiff] would never have a seizure again that [he] would not work there anymore." (Dkt. Nos. 62-2, p. 92). Plaintiff further states that: "What [Defendants] did not appreciate was that Plaintiff changed his medication in January 2014 and has not suffered a seizure since that time." (Dkt. No. 70-11, p. 35).

According to the Section 72 leave notice letter, Defendants concluded that Section 72 leave was "necessary both to protect [Plaintiff's] own health, the health and safety of those around [Plaintiff] and to avoid a severe interference with operations." (Dkt. No. 62-4, p. 2). The letter states that the reason for the decision for putting Plaintiff on leave and seeking a Section 72 medical examination "is the fact that you were observed on November 18, 2013, while on duty, having a seizure while at Police Headquarters." (*Id.*). The letter also states that a note from Plaintiff's own doctor restricted him from operating a vehicle or operating heavy machinery, "which in the City's view would preclude use of your weapon." (*Id.*). The letter was written by Mayor Julius, not Chief Gifford. (*Id.*). Moreover, consistent with the letter, Chief Gifford testified that he was concerned about public safety. (Dkt. No. 62-7, pp. 19, 26). Next, the decision to keep Plaintiff on leave was driven by the results of the Section 72 examination by Dr. Silverman, not the personal opinions of Chief Gifford. Dr. Silverman concluded that, due to Plaintiff's medical condition, he was not fit to return to duty as a police

officer. (Dkt. No. 62-5). Chief Gifford's deposition testimony corroborates Dr. Silverman's legitimate concern that if a police officer suffers a seizure "while [he] is performing his duties, such as weapon drawn, driving a car, making an arrest and that occurs, there's a possibility that that would jeopardize public safety." (Dkt. No. 62-7, p. 27).

Notably, during Chief Gifford's deposition, he was confronted about an alleged statement he made suggesting that Plaintiff would not be permitted to return to work unless a doctor guaranteed that he would not suffer another seizure. (Dkt. No. 62-7, p. 21). Chief Gifford acknowledged that: "I related to [Plaintiff] that I was concerned about the safety of the public and I need assurances that [Plaintiff was] fit for duty." (*Id*.). Chief Gifford's explanation is consistent with Defendants' documented concern that Plaintiff's condition could jeopardize public safety and inhibit his ability to perform his duties. (*See*, *e.g.*, Dkt. Nos. 62-5; 62-7, p. 27).

The record also shows that Defendants were aware of Plaintiff's seizure condition when they hired him. (Dkt. No. 62-3). Plaintiff's medical history form attached to his application for employment indicated that Plaintiff had suffered seizures in the past, and stated that Plaintiff was taking "preventative medication." (*Id*.). Further, Defendants were aware that Plaintiff had suffered a seizure-like event in 2005 while he was operating his personal vehicle off-duty. (Dkt. No. 62-7, pp. 16–17). JPD investigated the 2005 incident but did not require Plaintiff to undergo a medical fitness examination and did not take any disciplinary action against Plaintiff. (Dkt. Nos. 62-11, ¶¶ 31–33; 69, ¶¶ 31–33). Therefore, the record shows that JPD was aware of Plaintiff's seizure condition since he was hired in June 2002, yet Defendants did not take any employment action until after the November 2013 seizure when Plaintiff suffered a seizure while on duty. These facts further undermine Plaintiff's theory that his placement on Section 72 leave was inspired by discriminatory motive.

Plaintiff also questions Defendants' reliance on the opinion of Dr. Silverman, arguing that he "was not the right doctor to determine the suitability of Plaintiff's continued employment." (Dkt. No. 70-11, p. 33). Plaintiff points to his lack of qualifications, the contrary opinions of the two neurologists, and the final decision of the hearing officer. (*Id.*, pp. 27–38). However, at most, Plaintiff has adduced evidence that Dr. Silverman was wrong in his opinion about Plaintiff, not that Defendants were wrong to rely on him. Indeed, Section 72 states that "the appointing authority may require [its] employee to undergo a medical examination to be conducted by a medical officer selected by the civil service department [ ] having jurisdiction." N.Y. Civ. Serv. Law § 72(1).

Here, the record shows that Dr. Silverman was board certified in both occupational medicine and internal medicine, and had been practicing medicine since 1978. (Dkt. No. 70-7, p. 31). Dr. Silverman previously served as president of the New York Occupational and Environmental Association, and was on the Board of Delegates for the American College of Occupational and Environmental Medicine at the time he testified before the Section 72 hearing officer. (*Id.*). Moreover, Dr. Silverman's Section 72 report appears to be thorough, well-reasoned, and based on Plaintiff's undisputed medical history. (*See* Dkt. No. 62-5). Further, Dr. Timothy Lynch examined Plaintiff on February 4, 2015, approximately *11 months after* Dr. Silverman's IME, a significant period of time, especially given Plaintiff's transition onto a new antiepileptic medication which, by all accounts, was better-suited to address Plaintiff's condition. (*See* Dkt. Nos. 62-5; 70-5). Notably, it was Dr. Timothy Lynch's opinion that the hearing officer found "dispelled" the negative findings of Dr. Silverman. (Dkt. No. 70-6, p. 2). The record shows that Defendants proceeded through the Section 72 appeal process in accordance with the requirements of the law, and promptly allowed for Plaintiff's return to work

after the hearing officer credited Drs. Matthew Lynch and Timothy Lynch and found that Plaintiff was fit for duty. (*See* Dkt. Nos. 62-2, p. 77; 70-6). Thus, there is no evidence indicating that Dr. Silverman's report, nor Defendants' reliance on that report was inappropriate or motivated by any discriminatory purpose.

In sum, Plaintiff has failed to adduce evidence that reasonably supports a finding of discriminatory animus based on his epilepsy. In other words, viewing the evidence in the light most favorable to Plaintiff, a jury could not reasonably find that Defendants' stated reason for the adverse action was a pretext for unlawful discrimination. Accordingly, Defendants are entitled to summary judgment on Plaintiff's ADA discrimination claim. *See Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 251–57 (S.D.N.Y. 2015) (granting summary judgment where plaintiff failed to adduce sufficient evidence to show that she was terminated because of her disability, despite establishing a prima facie case); *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 142–46 (E.D.N.Y. 2015) (granting summary judgment for defendant where plaintiff put forth "no evidence [ ] from which discrimination could be inferred"); *Cady v. Bolivar-Richburg Cent. Sch. Dist.*, No. 12-CIV-1121, 2016 U.S. Dist. LEXIS 164650, at *39–44, 2016 WL 8291111, at *10–11 (W.D.N.Y. Nov. 28, 2016) (granting summary judgment where plaintiff failed to produce any evidence that defendant's reduction of plaintiff's position to part-time was pretextual disability-based discrimination).

## B.  ADA Retaliation

Plaintiff's Complaint further alleges that Defendants retaliated against him in violation of the ADA. (*See* Dkt. No. 1, ¶¶ 43–46). Retaliation claims brought under the ADA are examined under the three-step *McDonnell Douglas* burden-shifting framework. *Treglia*, 313 F.3d at 719. At the first step, Plaintiff must establish a prima facie case, which requires her to show that: (1)

she engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Treglia*, 313 F.3d at 719. Again, the prima facie showing is *de minimis*. *Id*. "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Id*. at 721. "If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" *Id*. (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

In this case, neither Plaintiff's Complaint nor his motion papers point to any type of protected activity. (*See* Dkt. Nos. 1; 70-11). "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). Nor does Plaintiff allege or argue, much less offer evidence, that Defendants were aware of any protected activity, or that an adverse action was caused by protected activity. Nonetheless, the Court has reviewed the record and finds no support for any theory of ADA retaliation.[4] Accordingly, Plaintiff has failed to meet his burden to show a prima facie case of ADA retaliation. *See Castro v. City of New York*, 24 D. Supp. 3d 250, 268–70 (E.D.N.Y. 2014) (granting summary judgment where the plaintiff failed to meet his prima facie

---

[4] Although Plaintiff testified at his deposition that he suffered retaliation because he "argued that his illness was covered under the ADA," (Dkt. No. 62-2, p. 86), Plaintiff has not offered any evidence that this conversation ever took place, nor has Plaintiff even alleged who this conversation was with, when it occurred, or whether he informed Defendants that he felt discriminated against because of his disability. Nevertheless, even if Plaintiff could show that this alleged conversation occurred, nothing in the record establishes a causal connection between the alleged protected activity (*i.e.* his belief that his disability was covered by the ADA), and any adverse employment action. To the extent Plaintiff relies on his law suit against the City as the basis for his retaliation claim, (*Id.*, p. 85), the record shows that Plaintiff's suit was filed in June 2016, long after Plaintiff was placed on Section 72 leave and required to undergo medical examination. Accordingly, Plaintiff has failed to offer any valid theory or supporting evidence to establish that he engaged in a protected activity.

burden to demonstrate that he engaged in any protected activity); *Mendillo v. Prudential Ins. Co. of Am.*, 156 F. Supp. 3d 317, 344 (D. Conn. 2016) (granting summary judgment for the defendant where plaintiff failed to establish that she engaged in protected activity, and where the plaintiff's discussions with her supervisor about her disability did not make the defendant aware that the plaintiff was engaging in any protected activity).

Moreover, even if Plaintiff made a prima facie case, his retaliation claim would still fail because Defendants have shown a legitimate reason for the adverse action here, as discussed above. Defendants cited the public safety risk associated with Plaintiff' seizure disorder, along with Plaintiff's undisputed failure to adhere to his prescribed treatment regime as the reasons for placing him on Section 72 leave. (Dkt. No. 62-10, pp. 22–26). In contrast, Plaintiff has failed to point to any evidence that reasonably supports a finding of prohibited retaliation. Indeed, based on a careful review of the record, there is no evidence whatsoever to suggest that Defendants' reason was a pretext for unlawful retaliation. Accordingly, Defendants are entitled to summary judgment on Plaintiff's ADA retaliation claim.

### C. ADA Medical Exam Claim

Plaintiff's Complaint alleges that Defendants violated the ADA, 42 U.S.C. § 12112(d)(4), when Plaintiff was compelled to undergo a medical examination pursuant to Section 72. (Dkt. No. 1, ¶¶ 37–39). The statute states that: "A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4).

In this case, Defendants have adduced evidence that they placed Plaintiff on Section 72 leave and required a medical examination out of concern for public safety after Plaintiff suffered a seizure at work in November 2013. (*See*, *e.g.*, Dkt. Nos. 62-5, pp. 9–10; 62-7, pp. 18–19, 22). Defendants have also adduced evidence that, as a police officer, Plaintiff's fitness for duty is of utmost relevance to his ability to perform essential job functions, including driving a motor vehicle and operating a service weapon. (*See*, *e.g.*, Dkt. No. 62-7, pp. 18–19, 21–23). Thus, Defendants have shown that the Section 72 examination was job-related and consistent with business necessity.

Although Plaintiff disagrees with Dr. Silverman's opinion and the outcome of the Section 72 examination, he has not adduced any evidence that Defendants' *decision to require an examination* was unrelated to his job as a police officer or unnecessary for the Johnstown Police Department. Accordingly, Plaintiff's claim that Defendants violated the ADA by requiring a Section 72 medical examination must be dismissed. *See Grassel v. Dep't of Educ. of City of New York*, No. 12-CIV-1016, 2017 U.S. Dist. LEXIS 39683, at *29, 2017 WL 1051115, at *10 (E.D.N.Y. Mar. 20, 2017) ("Accordingly, the Court finds, as a matter of law, that the DOE had a vital business necessity to determine Grassel's fitness to perform his duties as a teacher and that the 2011 Exam and disability-related inquiry was appropriately tailored to achieve that purpose. Grassel's ADA claim, therefore, is dismissed.").

### D. State Law Claims

Finally, having found that all of Plaintiff's federal claims are subject to summary judgment, the Court declines to exercise jurisdiction over Plaintiff's remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over [pendent state law claims] if . . . the district court has dismissed all claims over

which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (holding that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment") (citing *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (2d Cir. 1974)).  Accordingly, Plaintiff's state law claims against Defendants are dismissed.

## V.    CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 62) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's cross motion for summary judgment (Dkt. No. 70) is **DENIED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and finally, it is

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:    March 27, 2019
         Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge